UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-CR-112 |
| | ) | (PHILLIPS/SHIRLEY) |
| MELVIN DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT & RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter comes before the Court upon the defendant's Motion Suppress Evidence [Doc. 18], which was filed on October 31, 2005. The parties came before the Court for a suppression hearing on December 16, 2005. The government was represented by Assistant United States Attorney Steven H. Cook, and the defendant was represented by Christopher Oldham. At the conclusion of the hearing, the Court took the motion and related filings under advisement.

The defendant is charged in a two-count Superseding Indictment [Doc. 15] alleging that on March 9, 2005, the defendant possessed crack cocaine with intent to distribute (count one), and that on August 24, 2005, the defendant possessed crack cocaine on and within 1,000 feet of a public school (count two). The defendant argues that he was unlawfully seized in violation of his Fourth Amendment rights on March 9, 2005 and August 24, 2005, and that the subsequent searches

were therefore unconstitutional. [Doc. 19]. The government opposes the defendant's motion, arguing that both arrests were lawful and that the evidence obtained incident to those arrests and the statements made subsequent thereto were lawfully obtained. [Doc. 28].

## I. SUMMARY OF TESTIMONY

At the suppression hearing, the government presented the testimony of Investigator Todd Gilreath of the Knoxville Police Department ("KPD"). Investigator Gilreath testified that in March, 2005, he was a Knoxville Organized Crime Unit Investigator assigned to the FBI Violent Crime Task Force. He testified that he had been an officer with KPD since 1993. Investigator Gilreath testified that after spending his first year undercover, he was assigned to the patrol division for four or five years. He testified that during that time, he was assigned primarily to East Knoxville and in particular to the Walter P. Taylor Housing Development, where he spent the majority of his time on foot patrol. Investigator Gilreath testified that he became personally familiar with the defendant during his patrol of this housing development because the defendant lived there with his mother. Investigator Gilreath testified he knew the defendant's mother as Vanessa Tate, and that he knew the defendant as "Melvin Tate," "Melvin Davis," "Little Melvin," and "Ragu." Investigator Gilreath said that he was later assigned to guard the defendant in the hospital after the defendant was wounded in a shooting. Investigator Gilreath recalled that the defendant was in the hospital under the name "Melvin Tate," and that he assumed at the time that "Melvin Tate" was the defendant's real name. The government introduced a January 21, 1999 booking photo [Gov. Ex. 1]; a January 20, 1999 arrest report [Gov. Ex. 2]; and a January 20, 1999 property receipt [Gov. Ex. 3], all identifying the defendant as "Melvin Tate."

Investigator Gilreath testified that around noon on March 9, 2005, he received information from a confidential informant that the defendant was "posted up"[1] on the 2500 block of Martin Luther King Avenue in Knoxville. Investigator Gilreath said that this confidential informant had provided reliable and accurate information more than ten times in the past. Gilreath stated that he was familiar with this block of Martin Luther King Avenue and knew it to be a high drug trafficking area. Gilreath stated that he drove to this area along with KPD Lieutenant Mark Fortner. He observed the defendant in front of two businesses located at 2525 and 2527 Martin Luther King Avenue. Gilreath stated that both of these businesses had been raided previously and were not opened as legitimate operations. Gilreath stated that he circled the block and parked in the parking lot of a market at the corner of Martin Luther King Avenue and Chestnut. He stated he could see the defendant from this vantage point. Gilreath stated that it was a cold, windy March day, and that there was no apparent reason for the defendant to be just standing there.

Gilreath stated that he called the Organized Crimes Unit in order to request a check on the status of the defendant's driver's license. Gilreath stated that he requested information for a person with the last name of Tate who was born in 1980. Gilreath stated that he was advised that a Tate with the birthdate of February 7, 1980 was located and that this driver's license was "not on file." Gilreath stated that he knew that Tate was born in 1980 and that this "had to be him." Gilreath also stated that "not on file" meant that the driver had no valid driver's license. The government introduced the report of this inquiry. [Gov. Ex. 5]. The report reflects that the inquiry was made at

---

[1] Investigator Gilreath testified that "posted up" is a term used to describe a street-level crack dealer standing around waiting for chronic crack users to approach him.

12:19 p.m., which Investigator Gilreath testified was 12:19 p.m. "Nashville time" and 1:19 p.m. Eastern Standard Time.

Gilreath testified that the defendant stayed at this location for approximately 20-25 minutes before he got in a light blue Nissan Maxima and began driving east on Martin Luther King Avenue. Gilreath stated that he pulled out behind the defendant's car and followed him. Gilreath testified that the defendant then pulled into a Bi-Lo parking lot about three blocks away. Gilreath testified that there were several people "posted up" in this parking lot, and that he knew this to be a high crime area. Gilreath stated that he was in an unmarked car and not in uniform and therefore did not feel it was safe to pull into the parking lot. Gilreath stated that he circled the Bi-Lo and parked on another street where he could still see the defendant's car.

Gilreath testified that the defendant pulled out of the Bi-Lo parking lot and started traveling south on Harrison, passing right in front of Gilreath. Gilreath said that he pulled out behind the defendant and followed him for approximately three blocks. Gilreath stated that the defendant pulled into the parking lot of a barbershop on the corner of Harrison and Wilson. At this point, Gilreath stated that he radioed for a marked car. Gilreath testified that the defendant got out of his car and started to walk through the front door of the barbershop. Gilreath said that he got out of his car as well and stepped through the door with the defendant. He said that he asked the defendant whether he had a driver's license, and that the defendant replied that he did not think that he had one. Gilreath stated that the defendant was wearing a fleece warm-up suit and that he observed marijuana stuck to the abdomen and thigh area of the defendant's clothes. Gilreath stated that Lieutenant Fortner arrived, and the defendant was placed in custody. Gilreath testified that

4

Case 3:05-cr-00112   Document 31   Filed 01/13/06   Page 4 of 16   PageID #: 15

following the defendant's arrest, the defendant was searched, and crack cocaine was found in his sock.

Investigator Gilreath testified that the defendant was transported to the Organized Crimes Unit, where he was advised of his Miranda rights. Investigator Gilreath said that the defendant stated that he understood those rights and further stated, "I'll do what I can to help myself." Investigator Gilreath stated that an FBI Special Agent came to meet with the defendant, and the defendant was again read his Miranda rights. The government introduced into evidence an Advice of Rights form signed by the defendant as "Melvin Davis." [Gov. Ex. 8].

Investigator Gilreath testified that after the defendant was questioned, the decision was made to release him and allow him to cooperate as a confidential informant for the KPD and FBI. Investigator Gilreath stated that during this interview, he learned for the first time that the defendant's real name was Melvin Davis. Investigator Gilreath stated that he pulled the driver's license record for the defendant under the name "Melvin Davis" and learned that the defendant had a suspended driver's license. The government introduced the record of this driver's license inquiry, which reflects that the defendant's driver's license was suspended. [Gov. Ex. 6].

Investigator Gilreath stated that almost immediately and for several months thereafter, the defendant started providing information. Investigator Gilreath testified that during the next three months, he had conversations with the defendant about obtaining his driver's license. Investigator Gilreath further testified that the defendant stated that he had gone to the Department of Safety and learned that it would take a lot of money to get his license reinstated, and that he had asked for financial assistance. Investigator Gilreath stated that he told the defendant that KPD was not willing to assist the defendant in this regard.

5

Investigator Gilreath stated that around mid-August, 2005, he began receiving information that the defendant was dealing drugs again. On the morning of August 24, 2005, Investigator Gilreath stated that he received a call from a confidential informant, stating that "Ragu" was back around the corner of the building located at 2500 Martin Luther King Avenue "smoking dope." He stated that as he drove to this area, he received another call from the confidential informant, who stated that the defendant was still at that location and was there with two young females. Investigator Gilreath testified that he considered this confidential source to be reliable, as the informant had provided accurate information eight to ten times in the past.

Investigator Gilreath stated that he pulled his unmarked vehicle into a parking lot down the street to observe the defendant. He stated that the defendant pulled out in a black Jeep Cherokee and began driving south on Chestnut. Investigator Gilreath stated that the defendant had two young females in the car with him. He further stated that as he began to follow the defendant, he saw an exchange between the defendant and one of the young females who was sitting in the front seat. Investigator Gilreath stated that the defendant pulled into the parking lot of Austin East High School and stopped his vehicle. Investigator Gilreath said that he approached the vehicle and asked the defendant whether he had a driver's license. The defendant stated that he did not. Investigator Gilreath stated that as he was talking to the defendant, he observed marijuana on the console and detected an extremely strong odor of marijuana. Investigator Gilreath stated that he asked the young female who had been sitting in the front seat whether she had anything on her, and that she said that the defendant had given her something to hold. Investigator Gilreath stated that she held out her purse and opened it, and that Investigator Gilreath found a baggie of what appeared to be crack

cocaine in the bottom of her purse. Investigator Gilreath stated he took custody of the baggie, and that a field test and subsequent FBI test indicated that the substance was crack cocaine.

Investigator Gilreath testified that the defendant was taken into custody and transported to the Organized Crime Unit, where he was advised of his Miranda rights. Investigator Gilreath testified that the defendant admitted to possessing marijuana but denied that the crack cocaine found in the girl's purse was his. Investigator Gilreath stated that during his interview, the defendant was advised of his Miranda rights two more times, and that the defendant admitted to dealing crack cocaine.

The defendant called the defendant's mother, Vanessa Tate, and the defendant's father, Melvin Davis. Both Tate and Davis testified that the defendant was commonly known as "Little Melvin" or "Melvin Davis" in the community. Tate testified that the defendant had never used the name Tate. Davis testified that the defendant had not used the name Tate since he was a young child.

The defendant also testified. He stated that Davis is the last name he commonly goes by, and that he has never used the name Tate. The defendant introduced several juvenile court petitions [Def. Exs. 1, 2, 3, 4, 5], a June 6,1996 Notice of Transfer to Criminal Court [Def. Ex. 6], and several indictments, warrants, and judgments from the Knox County Criminal Court [Def. Coll. Ex. 7], all of which identify the defendant as "Melvin Davis."

## II. FINDINGS OF FACT

The Court finds that around noon on March 9, 2005, Investigator Todd Gilreath received information from a previously reliable confidential informant that the defendant was "posted up" on the 2500 block of Martin Luther King Avenue in Knoxville, Tennessee. Investigator

7

Gilreath corroborated this information when he went to this location and recognized the defendant. Investigator Gilreath contacted the Organized Crimes Unit and asked for a check on the status of the defendant's driver's license under the name "Tate" and the year of birth of 1980. Investigator Gilreath knew that the defendant went by several names, including "Melvin Tate," "Melvin Davis," "Little Melvin," and "Ragu"; however, he believed that the defendant's real name was Melvin Tate. Investigator Gilreath was advised that the check revealed that a "Tate" with the birthdate of February 7, 1980 had no driver's license on file.

After following and observing the defendant driving for a couple of blocks, Investigator Gilreath observed the defendant pull into and park in front of a barbershop at the corner of Harrison and Wilson. Investigator Gilreath then pulled into the parking lot. The defendant entered the barbershop, as did Investigator Gilreath, who then approached the defendant and asked the defendant whether he had a driver's license. The defendant stated that he did not think that he did. At that time, Investigator Gilreath also observed marijuana stuck to the front of the defendant's clothing, and the defendant was placed under arrest. Following his arrest, the defendant was searched, and crack cocaine was found in his sock. During a subsequent interview with the defendant, Investigator Gilreath learned for the first time that the defendant's real name was Melvin Davis.

The defendant agreed to cooperate with KPD and the FBI as a confidential informant. In mid-August, 2005, Investigator Gilreath received information from a previously reliable confidential informant that the defendant was parked behind a building at 2500 Martin Luther King Avenue smoking marijuana with two young females. Investigator Gilreath corroborated this information when he went to this location and observed the defendant in a vehicle with two young

8

females. Investigator Gilreath followed the defendant as he drove to the parking lot of Austin East High School. While the defendant was driving, Investigator Gilreath observed him pass something to the female in the passenger seat. After the defendant had stopped his vehicle in the Austin East parking lot, Investigator Gilreath approached the vehicle and asked the defendant whether he had a valid driver's license. The defendant stated that he did not. During their conversation, Investigator Gilreath observed marijuana on the console, and he also detected the strong odor of marijuana from the car. The female passenger in the front seat stated that the defendant had given her something to hold. The female passenger consented to Investigator Gilreath looking in her purse and held it out for him, at which time Investigator Gilreath found a baggie of crack cocaine. In a subsequent interview with law enforcement, the defendant admitted to selling crack cocaine.

### III. POSITIONS OF THE PARTIES

The defendant argues that Investigator Gilreath did not have a reasonable and articulable suspicion that a traffic violation had occurred prior to stopping the defendant on March 9, 2005 and August 24, 2005. With respect to the March 9, 2005 stop, the defendant argues that the driver's license check for "Tate" did not create reasonable suspicion to stop the defendant because he was not known by that name. With respect to the stop on August 24, 2005, the defendant argues (1) that Investigator Gilreath's knowledge of the status of the defendant's driver's license came from the illegal stop in March, 2005 and (2) that Investigator Gilreath took no reasonable steps to confirm his guess that the defendant had not obtained a valid driver's license in the months since his last arrest.

The government responds that both arrests were lawful and that the evidence obtained incident to those arrests and the statements made subsequently thereto were lawfully obtained. With

9

respect to the March 9, 2005 arrest, the government contends that Investigator Gilreath had probable cause to believe that the defendant had committed the misdemeanor offense of driving without a driver's license. The government argues that the fact that Investigator Gilreath checked the driver's license history under the name of Tate, rather than Davis, is irrelevant to the probable cause analysis for two reasons. First, the government argues, the investigator's mistake was a reasonable one because the defendant had often used the name Tate in the past and it was the name with which Investigator Gilreath was familiar. Second, the government contends, if the check had been made under the defendant's correct name, the check would have revealed that the defendant's driver's license was in fact suspended. Thus, the government argues, the officer's belief that the defendant was driving without a driver's license was not only objectively reasonable, it was also correct. Further, the government argues that Investigator Gilreath's initial contact with the defendant at the barbershop was a consensual encounter and that the defendant's admission that he did not have a driver's license, along with the officer's observation of marijuana on the defendant's clothes, provided probable cause for his arrest.

With respect to the August 24, 2005 arrest, the government argues that the police had regular contact with the defendant between his arrest in March, 2005 and the August, 2005 incident and were aware that the defendant had attempted to obtain a driver's license but lacked the financial resources to do so. Therefore, the government argues that Investigator Gilreath had reasonable suspicion to approach the defendant and ask him whether he had a valid driver's license.

## IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. If an "officer has probable cause to believe that a traffic violation has

occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S. 213, 244 n.13 (1983)).

An officer may also briefly detain an individual on less than probable cause: "[A] brief investigative stop, or Terry stop, by an officer who is able to point to 'specific and articulable facts' justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure." United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)) (other citations omitted). Although an officer may not rely upon a mere hunch to support a Terry stop, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Depending upon the circumstances giving rise to the investigative stop, the officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to identify the suspect and either confirm or dispel the officer's suspicions. Martin, 289 F.3d at 396. If the suspect's answers fail to supply the officer with probable cause to arrest the suspect, then the officer must release the suspect. Id. at 396-97.

11

With respect to the March 9, 2005 arrest, the defendant argues that Investigator Gilreath did not have reasonable suspicion to stop him and inquire about the status of his driver's license because the driver's license check that Investigator Gilreath requested was not run under the defendant's real name. The Court finds that Investigator Gilreath's actions were reasonable in this case. The defendant had used the name "Melvin Tate" in the past, and this is the name by which Investigator Gilreath knew the defendant. Thus, while Investigator Gilreath may have been mistaken about the defendant's true name, such a mistake was reasonable under the circumstances. The Supreme Court has long recognized that the probable cause standard allows for the possibility of factual error. See Brinegar v. United States, 338 U.S. 160, 176 (1949) ("Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."). Accordingly, the Court finds that Investigator Gilreath had reasonable suspicion to approach the defendant and inquire about the status of his driver's license on March 9, 2005.

Even if Investigator Gilreath did not have reasonable suspicion, the Court finds that Investigator Gilreath's initial contact with the defendant at the barbershop on March 9, 2005 was a consensual encounter. The Fourth Amendment is not implicated by every encounter between citizens and law enforcement officers. Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968) ("not all personal intercourse between policemen and citizens involves 'seizures' of persons"). "Only when the officer, by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id. Thus, an officer may approach an individual and ask general questions without having any reasonable suspicion of criminal activity,

12

as long as the officer "refrain[s] from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." United States v. Waldon, 206 F.3d 597, 603 (6th Cir.), cert. denied, 531 U.S. 881 (2000). In particular, the Fourth Amendment is not implicated when an officer (such as Investigator Gilreath) approaches someone (such as the defendant) in a public place (like a barbershop) and simply asks some questions (such as whether the defendant has a driver's license). Florida v. Bostick, 501 U.S. 429, 434 (1991); Florida v. Royer, 460 U.S. 491, 497 (1983). Only if the defendant was deemed to be seized would constitutional safeguards come into play.

The Sixth Circuit utilizes the Mendenhall test, United States v. Mendenhall, 446 U.S. 544 (1980), to determine if and when a seizure has occurred. See United States v. Saperstein, 723 F.2d 1221, 1225 (6th Cir. 1983) (citing cases). This test indicates that a seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" and instructs the Court to consider whether there was present "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. None of these factors nor any other indicia of physical force or restraint on the defendant's liberty were present in this case. Investigator Gilreath approached the defendant as he was entering the barbershop and asked him about the status of his driver's license. The Court finds no evidence to suggest that, in so doing, Investigator Gilreath acted in an intimidating manner such that a reasonable person would not have felt free to leave. Accordingly, this encounter did not rise to a

13

seizure; it was only a consensual encounter or interview, and hence, constitutional safeguards, including the Fourth Amendment, were not implicated by this encounter.

Finally, the observation of marijuana on the defendant's clothing constituted probable cause to arrest the defendant upon the belief that a criminal offense was being or had been committed. See United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996) ("Police may arrest a person without a warrant if they have probable cause at the time of the arrest to believe that the person has committed or is committing a crime."). The search incident to arrest is a valid exception to the warrant requirement, Michigan v. DeFillippo, 443 U.S. 31, 35 (1979), including the search of the person, United States v. Robinson, 414 U.S. 218, 235 (1973).

With respect to the August 24, 2005 arrest, the defendant argues that Investigator Gilreath's belief that the defendant's driver's license was suspended was merely a hunch and was stale. The Sixth Circuit has held that an officer's check of the defendant's driving status three weeks prior to the stop provided reasonable suspicion that the defendant was still driving without a valid driver's license at the time of the stop. United States v. Sandridge, 385 F.3d 1032, 1036 (6th Cir. 2004), cert. denied, 125 S. Ct. 1099 (2005). In so holding, the Court reasoned as follows:

> In situations where the criminal activity is of an ongoing nature, it will take longer for the information to become stale. See United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001) ("Evidence of ongoing criminal activity will generally defeat a claim of staleness."). Driving without a valid license is a continuing offense – in contrast, say, to a speeding or parking violation – and there are no facts in the record suggesting that Officer Grubb should have assumed that Sandridge's ongoing offense had ceased between March 5 and March 27, 2002.

Sandridge, 385 F.3d at 1036; see also United States v. Mans, 999 F.2d 966, 968 (6th Cir.), cert. denied, 510 U.S. 999 (1993) (holding that an officer had reasonable suspicion to stop the defendant

14

because the officer recognized the defendant from prior arrests and knew that his driver's license had been revoked). In the present case, Investigator Gilreath knew as a result of the defendant's arrest on March 9, 2005 that the defendant did not have a valid driver's license. Furthermore, because the defendant was operating as a confidential informant for the KPD and FBI, Investigator Gilreath had been in contact with the defendant in the months leading up to the defendant's August 24, 2005 arrest and thus also knew that the defendant had attempted to get his driver's license reinstated but could not afford to do so. Based on these facts, the Court cannot say that Investigator Gilreath should have assumed that the defendant's ongoing offense of driving without a valid driver's license had ceased. To the contrary, it was reasonable for Investigator Gilreath to assume, based upon the defendant's admitted difficulty (due at least in part to his financial inability) in getting his license reinstated, that the "ongoing nature" of the defendant's offense, namely driving without a valid's license, had continued up to the time of the stop. Accordingly, the Court finds that the information Investigator Gilreath had was not stale. The Court therefore finds that Investigator Gilreath had reasonable suspicion to approach the defendant in his vehicle and to inquire about the status of his driver's license. Moreover, once Investigator Gilreath smelled the strong odor of marijuana and saw, in plain view, marijuana in the vehicle, he had probable cause to arrest, and a search incident to arrest was proper. Furthermore, it appears to the Court from the facts, that the female passenger consented to the search of her purse. In any event, the defendant had no reasonable expectation of privacy in the female passenger's purse, and thus had no standing to object to, or vicariously assert any objection to, the search of her purse. See United States v. Myers, 102 F.3d 227, 231 (6th Cir. 1996), cert. denied, 520 U.S. 1223 (1997).

15

## IV. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that the defendant's Motion to Suppress Evidence [Doc. 18] be **DENIED**.[2]

**ENTER:**

   s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).